UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

HESEN JABR,                                          **COMPLAINT AND JURY DEMAND**

                Plaintiff,

   -against-

NYU-LANGONE HOSPITAL,

                Defendant.
----------------------------------------------------x

Hesen Jabr, Plaintiff, by her attorneys, MUSA-OBREGON LAW, P.C., Council on American-Islamic Relations, New York (CAIR-NY) and Jonathan D. Wallace, hereby state, upon information and belief:

## PRELIMINARY STATEMENT

Plaintiff Hesen Jabr brings this action against NYU-Langone Hospital for unlawful discrimination, harassment, and the creation of a hostile work environment in violation of federal and state anti-discrimination laws. Plaintiff, an experienced and dedicated nurse, was subjected to persistent discriminatory treatment based on her Palestinian ethnicity and Muslim religion. Despite her commitment to patient care and professional excellence, NYU-Langone Hospital and its agents fostered an environment of bias, exclusion, and mistreatment, significantly impacting her ability to perform her duties in a safe and professional setting.

Throughout her employment, Plaintiff endured differential treatment, derogatory comments, and unjustified scrutiny that her colleagues of other ethnic backgrounds did not face. Supervisors and administrators failed to address these concerns, allowing a toxic work culture to persist. Furthermore, when Plaintiff reported these discriminatory practices, she faced retaliation, further exacerbating the hostile environment.

NYU-Langone Hospital had a legal and ethical duty to provide a workplace free from

discrimination and harassment. Instead, it knowingly allowed a culture of intolerance to flourish, causing Plaintiff emotional distress, professional harm, and financial losses. Plaintiff now seeks legal redress for the discrimination she endured, including compensatory and punitive damages.

Plaintiff asserts that no employee should be subjected to such treatment in their workplace and demands justice for the violations of her rights.

## JURISDICTION

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e.

2. This court has supplemental jurisdiction over plaintiff's related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

## VENUE

3. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because all the Defendants reside in the State of New York and some or all of the Defendants are residents within the Southern District of New York.

## PARTIES

4. Plaintiff Hesen Jabr is a citizen of the State of New York, and was an employee of Defendant NYU-Langone Hospital as defined in Title VII, the NYSHRL, and the NYCHRL, respectively.

5. Upon information and belief, Defendants NYU Langone Health System is a domestic or foreign corporations or limited liability companies with its corporate headquarters located in New York, NY and doing business in New York, NY. The Corporate Defendant is an employer as defined by Title VII, the NYSHRL, and the NYCHRL.

## THE FACTS

### INTRODUCTION

6. Plaintiff is of Palestinian origin and is an observant Muslim woman who wears a religious

head covering called a hijab in accordance with her sincerely-held beliefs.

7. Plaintiff graduated from the Nursing Program at University of Memphis, Tennessee in 2012.

8. Plaintiff wanted to follow in her mother's footsteps, who is also a Nurse Practitioner. In particular, Plaintiff's career goal was to provide care to mothers and their newborns.

9. After graduating, Plaintiff was hired at the Memphis Veterans' Administration Hospital, where she became certified in chemotherapy and dialysis treatment.

10. Plaintiff then worked at Lakeside Behavioral Health, an inpatient psychiatric care facility in Memphis, before moving to New York in 2014, where she performed contract work at Beth Israel Hospital in Medical-Surgical Nursing.

11. Plaintiff was then hired on a travel contract at NYU Langone, where she excelled in the Medical-Surgical and Step-Down Unit and was quickly offered a permanent position.

12. In 2017, Plaintiff transferred to the Labor and Delivery ("L&D") unit at NYU Langone.

13. Upon information and belief, Plaintiff was the only Palestinian and one of the few visibly Muslim women among the nurses and doctors in the L&D unit during her entire tenure.

14. Plaintiff joined the L&D unit during a chronic nursing shortage, when nurses at NYU were under immense pressure to overperform. Nevertheless, Plaintiff consistently earned high scores in performance evaluations.

15. In 2020, the COVID pandemic exacerbated the nursing shortage and pushed what were already challenging working conditions at NYU Langone to the breaking point.

16. During the pandemic, the staff attrition rate in the L&D unit reached an extreme high. Where once Plaintiff knew every veteran nurse on her floor, by 2021 L&D had become a 'skeleton crew' of new hires.

17. It was in this environment of extreme pressure on Plaintiff that she emerged as a leader among the L&D nursing staff, training the new hires while simultaneously taking on an

increased workload.

18. As a result, Plaintiff's L&D colleagues nominated her for the Sebastian Brun Compassionate Care Award for her exceptional perinatal care.

19. However, it was also in this environment of extreme pressure that Plaintiff was repeatedly subjected to a culture of ethnicity- and faith-based harassment in the workplace.

20. NYU Langone knowingly tolerated harassing comments from non-class member employees towards Plaintiff, while shielding those employees from complaints made against them.

21. Then, starting in 2023, NYU Langone hounded Plaintiff with baseless HR investigations into her social media posts about Palestine which criticized the Israeli government.

22. NYU Langone placed disproportionate scrutiny on Plaintiff's social media presence, selectively enforcing its policy against her while ignoring pro-Israeli government social media posts of non-class member employees.

23. On May 7, 2024, Plaintiff was honored with the Sebastian Brun Compassionate Care Award award in a ceremony hosted by NYU Langone. During her acceptance speech, Plaintiff took a moment to express her grief for the innocent victims of the genocide in Palestine, including mothers and their newborns.

24. On May 22, 2024, two weeks after her award acceptance speech, NYU Langone terminated Plaintiff, on the grounds that her speech was "offensive.

<u>DEFENDANT KNOWINGLY PERMITTED A CULTURE OF ETHNICITY-BASED HARASSMENT AT NYU LANGONE DIRECTED AT PLAINTIFF AND OTHER NURSING STAFF</u>

25. Dr. Alan Berger is a senior obstetrician at NYU Langone. He is an outspoken supporter of Israel.

26. Because of his specialization, he works with the L&D nurses on a daily basis. Dr. Berger often talked about attending AIPAC conferences while at work and bragged about his

connections with the Israel lobby.

27. Dr. Berger started mentioning AIPAC and Israel increasingly around Plaintiff when he found out that she is Palestinian. On one notable occasion in 2021, during a period when an earlier Israeli aggression in Gaza was in the news, Dr. Berger and Plaintiff were in the middle of attending to a patient together.

28. While Dr. Berger was stitching up a patient following a vaginal delivery, Dr. Berger stepped away from the patient and told Plaintiff , while still in the patient's room, "you know, the Palestinians had it coming," and went on to rant about how Israel "only responds in proportion" to Palestinian attacks.

29. Plaintiff stated she experienced brutal living conditions in Israel as a child, to which Dr. Berger "you must have done something to produce that kind of treatment from the Israeli army."

30. Plaintiff told Dr. Berger, "this is inappropriate to discuss in front of the patient," and resumed care of her patient while the resident finished suturing and Dr. Berger left the room.

31. Plaintiff did not make a formal complaint for fear of retaliation by Dr. Berger and HR. It was widely known on the unit that complaints were made to HR by other colleagues with no disciplinary actions taken.

32. On one occasion, shortly after the murder of George Floyd, during the Black Lives Matter protests across the country, Dr. Berger asked a Black nurse if there was coffee in the break room, and whether she preferred to drink it with milk. The nurse responded that she preferred to drink it without, to which Dr. Berger mockingly replied, "black coffee matters too, I guess."

33. On several occasions, Dr. Berger's patients complained directly to Plaintiff about Dr. Berger's lack of professionalism and for repeatedly bringing his personal politics into the

operating room.

34. In another incident around 2021, Dr. Andrew Scheinfeld, another Obstetrician and former employee of NYU Langone who is now retired, went against hospital protocol and ordered a C-section for a young black patient in labor without any of the prerequisite health indicators or outside approval.

35. Plaintiff, who was directly involved in the patient's care, assisted in escalating the matter up the chain of command along with the nurse who took over for the patient's care. The Maternal Fetal Medicine (MFM) department was contacted and intervened, stating there was no indication for a C-section.

36. Dr. Scheinfeld was not disciplined for attempting a c-section outside of the standard protocol for his black patient without approval, and when the plaintiff's nurse colleague complained to her manager for the patient's mistreatment, she was told to "be quiet" and "not make trouble."

37. Dr. Scheinfeld had a reputation among the NYU nursing staff for providing favorable treatment to his Jewish patients compared to his non-Jewish BIPOC patients, especially low-income Black patients. The L&D nurses all understand that they have to be more diligent in their care when it comes to Black patients due to such patients having higher infant mortality rates.

38. Plaintiff's coworker, another nurse, posted on social media about the incident, expressing her frustration that NYU Langone was shielding its physicians from consequences for bad behavior at the expense of the well-being of their patients.

39. Upon information and belief, the nurse also made complaints to NYU Langone's Human Resources about Dr. Scheinfeld.

40. In response, HR told the coworker that she was being "slanderous" and threatened her with termination if she did not stop posting on social media and drop her complaints about

Dr. Schienfeld. Eventually, the nurse was forced to resign from her position at NYU Langone. Plaintiff, along with other nurses, advocated for the reinstatement of the nurse who was forced to resign.

41. After this incident, Dr. Scheinfeld made the nurses' lives on the unit more difficult. At one point, Plaintiff was removed from a patient assignment without an explanation, later to find it was at Dr. Scheinfeld's request. Dr. Scheinfeld refused to allow Plaintiff to be assigned to any of his patients.

42. Management did not speak to Plaintiff about this incident for over a week and left her anxiously wondering if there would be any disciplinary actions done or if her performance evaluation would be affected in retaliation for her advocacy of the patient and her colleague.

43. Outside of the workplace, Plaintiff posted regularly about Palestine on her Instagram, Facebook, and WhatsApp status updates. On both platforms, she was connected with Sherri Cohen ("Ms. Cohen"), another nurse at NYU Langone.

44. Ms. Cohen would view Plaintiff's Whatsapp posts and post stories to her own Whatsapp story, encouraging violence against Palestinians. Plaintiff found these posts distressing, which led to a brief private text message exchange about their disagreements.

45. Ms. Cohen was trained by Plaintiff two years prior and when she asked the plaintiff where she was from, Plaintiff replied that she was Palestinian, to which Ms. Cohen replied: "Palestine doesn't exist."

46. In October 2023, about one week after the text messages with Cohen, Plaintiff was sent an email from NYU HR, informing her that she was the subject of an investigation regarding an employee complaint (presumably Cohen).

47. Plaintiff informed her manager that she needed to be pulled away from her duties in order to conduct this meeting with HR on the phone, which the manager reported knowing

nothing about.

48. HR asked whether Plaintiff ever discussed "the conflict in the Middle East" with her colleagues. In response, Plaintiff questioned why this was relevant to her job and why she was pulled from her shift to discuss her politics.

49. HR explained that the complaint pertained to her text messages with Cohen, who reported feeling unsafe around Plaintiff.

50. Plaintiff replied that she did not discuss politics at work and explained that what's going on in Palestine is personal to her as a Palestinian. Plaintiff told the HR representative that she was the one who felt unsafe around Ms. Cohen, who had told her that "Palestine doesn't exist."

51. In response, the HR representative apologized to Plaintiff for "very much Shanghaiing" Plaintiff into the meeting. At the end of the meeting, HR told Plaintiff she would follow up on the matter.

52. About two weeks later, in November, Plaintiff received an email from HR "following up" on the earlier "incident" and was once again pulled from her job to conduct a meeting with HR.

53. In the meeting, Plaintiff was shocked to see that HR had taken her private Instagram posts and projected them onto the screen. HR asked Plaintiff to explain them.

54. Plaintiff asked how HR got a hold of her private posts to which they replied, there are "some complaints" they are investigating.

55. Plaintiff became extremely guarded and felt ambushed once again. Thereafter, she requested to file an official complaint against Sherry Cohen, Dr. Alan Berger, and other co-workers by whom she felt threatened but about whom she had previously remained silent.

56. She was told that her complaints would be taken into consideration and followed up. At

this point, the plaintiff was worried about her job security and asked how her politics and private posts were relevant to her job. The HR representative replied that she was simply conducting an investigation. The HR Representative told Plaintiff that she would "talk to her bosses" and get back to the Plaintiff.

57. On or around 11/22/2023, Plaintiff was again pulled from work and questioned. Plaintiff asked the HR rep, Lauren Looney, what the issue was that HR felt the need to keep pulling her away from her duties to interrogate her as until that moment, she had not received any feedback over a month after the initial meeting was conducted. Plaintiff reiterated that her politics have nothing to do with her job duties.

58. Plaintiff also expressed to Lauren Looney how she felt harassed and bullied and she was anxiously checking her emails to see when she would receive another email correspondence from HR. The plaintiff expressed how this was negatively affecting her focus, job performance and workflow on the unit. Lauren Looney told Plaintiff that she would reach back out to her.

59. On 11/29/2023, plaintiff was called for a fourth meeting, while plaintiff was working, and was informed that HR is demanding she "stop posting" or risk termination. When Plaintiff asked what exactly she needed to do she was not given a direct answer.

60. The plaintiff replied that this is a personal opinion and that it was her right to free speech, expressing her sincerely held beliefs on her private social media, driven by the intense suffering she felt watching her homeland being decimated daily by 2,000 pound bombs killing women and children and destroying universities, schools, hospitals and all other civilian infrastructure, as well as residential neighborhoods.

61. Plaintiff asked Looney who she reported to, and Looney replied that she directly answers to the head of HR, Austin Bender.

62. Plaintiff updated her manager while crying in her office, expressing her distress at the

direction the HR meetings took. Her manager consoled her and gave her a hug with a reply of "I'm sorry, I wish there was something I could do."

63. The president and VP of nursing sent an email shortly after the phone call with HR to have yet another meeting with Plaintiff, this time with the original complainant, Ms. Cohen included, one day before Plaintiff was set to leave for approved vacation. The plaintiff replied she will be available after coming back from her approved vacation on 12/13.

64. On 12/6/2023, while on vacation, Plaintiff was doxed by a page called StopAntiSemitism on Instagram with a post from her private social media and her full name which she never disclosed on social media. NYU's Instagram page was tagged in the picture. The post accused Plaintiff of antisemitism and called on NYU to discipline her. Plaintiff immediately texted her manager expressing feeling threatened, harassed and bullied.

65. The plaintiff emailed HR requesting to decrease her hours at work as she felt unsafe knowing she could not trust her coworkers. After emailing Austin Bender from HR with her request to reduce hours due to her feeling unsafe at work, the reply came as a shock to the Plaintiff. Rather than empathize with her distress at the blatant targeting, Bender accused the Plaintiff of being anti-Semitic in an email and told her to delete the post in question and "similar posts" immediately. After consulting with several attorneys, the Plaintiff complied and deleted the post.

66. On 12/20/2023 the plaintiff met with the Vice President of nursing and Nursing Director of the Obstetrics Department ("OB") where she was told for the first time that she was in violation of the code of conduct. Plaintiff was told that she had made certain coworkers and patients uncomfortable. Plaintiff was once again told to "stop posting" with no direct answer to what it was she needed to stop posting. Plaintiff expressed her own discomfort and felt discriminated against as a Palestinian. The OB Nursing Director then told the

plaintiff they will speak with HR together to discuss what it was she could not post.

67. That same day, Plaintiff was called into a second meeting with the OB nursing director and her manager, where she received a final written warning, which demanded that she issue a "letter of contrition" on her social media accounts, delete all messages between herself and Cohen, and delete certain Instagram posts, or risk termination. Plaintiff's manager encouraged her to comply with the demands in order to protect her job, even if she did not believe in the contents of the demanded letter of contrition.

68. She was vaguely told once again to "stop posting." The plaintiff refused to sign a written warning that was presented to her and reminded the OB Nursing Director about the promise to speak to HR together to discuss what they deemed appropriate to post. The Nursing Director agreed t. Meanwhile, her manager stated, "Stick to posting about your cats and your dinners."

69. The next day, a video meeting was held with Plaintiff, Austin Bender, the Nursing Manager, and the OB Nursing Director. During the meeting, Austin Bender stated that there was no clear definition of what is and isn't allowed to be posted, but generally, Plaintiff was told to post news headlines and not her own opinions. The plaintiff asserted she would not sign the written warning, to which Austin Bender replied "that's fine, but you certainly must comply."

70. In another incident, one of Plaintiff's nursing coworkers, Hannah Charlton, yelled at the nursing station in front of patients and colleagues, "HESEN HATES JEWS." She was reported anonymously by a nurse on the unit. This added to Plaintiff's increasingly unsettling feeling that had been building for months.

71. Shortly before New Years, a follow up email was sent by the Plaintiff's manager requesting that Plaintiff follow through on the letter of contrition. After emailing Austen Bender to determine what exactly was being requested, Austin Bender indicated that a

comment Plaintiff made calling for peace under an old post was acceptable and "Happy New Year's" messages were exchanged. Plaintiff reasonably presumed that the matter was resolved.

72. Following the new year, Plaintiff started to record her grievances for short staffing and missed breaks more regularly. She also reported a coworker, Sonia Lander, who had previously made inflammatory social media posts demonizing Palestinians. Plaintiff reported that Sonia Lander had treated Plaintiff her in an unprofessional manner on the unit. The manager followed up with the Plaintiff complaints and agreed Lander's behavior was inappropriate.

RETALIATION AND ADVERSE EMPLOYMENT ACTIONS

73. Mid- January 2024, Bender contacted Plaintiff via email, informing her that "it had come to their attention that she wrongfully received a "5" (the highest mark one can receive) on her performance evaluation in October (preceding the alleged disciplinary action), and therefore she was not eligible for the end of year bonus she received and was ordered to pay it back. She was also told to pay back the cost of living raise she received on her first couple of paychecks as she was not eligible to receive that either, even though it was given hospital wide and was not merit based. Plaintiff's salary was decreased afterwards.

74. Plaintiff replied that this was inappropriate and retaliatory. Plaintiff asked how she may file an appeal. Bender replied that the time had passed to do so.

75. Plaintiff pointed out that in addition to the financial retaliation, she was not given any updates about her grievances regarding her coworkers and no thorough investigations were conducted regarding Berger, Cohen, Charlton, Lander, etc. as was her right according to the code of conduct. Plaintiff then stated that any further correspondence will be through an attorney. Shortly thereafter, the plaintiff retained the services of Musa Obregon Law, PC to assist with the financial retaliation she was facing.

76. In the following months, Plaintiff received multiple letters from the payroll office demanding that she pay back the money NYU said she owed. She replied there is an open investigation as this was now a legal matter. Plaintiff still receives letters to this day with threats of being sent to collections if payments are not made. Undersigned counsel sent a cease and desist letter dated October 16, 2024, but Plaintiff's credit score has been directly and negatively impacted by the actions of NYU.

77. In March of 2024, seemingly incongruent with the orders to pay back the raise and bonus, the Plaintiff was nominated for both the Daisy award and the Sebastian Brun Compassionate Care award by fellow nurses for her exceptional work in perinatal care and perinatal bereavement.

78. On 5/7/2024, the plaintiff attended the award ceremony and gave an acceptance speech for the award she received for her work with women who lost their babies during pregnancy and childbirth.

79. In her speech, which lasted about one and a half minutes, Plaintiff thanked her coworkers for nominating her for the award, her mother and grandmothers for raising her in a culture filled with compassion and kindness for all humans, and a small tribute to the women in her home country of Palestine who are currently losing their children and their lives during the ICJ recognized genocide. The plaintiff's coworkers cheered her on and the audience applauded loudly for her after the speech and took pictures with her. The photos were originally posted to the NYU Instagram page and then removed later that day.

80. On May 22, 2024, upon arriving to her unit to work her shift, Plaintiff was walked by her manager to the office of the president and vice president of nursing, where she was told that she ruined the ceremony, "put others at risk," and "offended people" in the audience with her speech. Plaintiff reported feeling grief and defeat and asked where they will go from there, the president replied, "that's what we will be spending the day figuring out."

81. After working nearly the entire shift feeling anxious and distracted, Plaintiff was then walked back to the office of the VP of nursing where Austin Bender was also waiting, and she was read her termination letter and escorted off the premises by a plain clothes police officer who told her she was not allowed back or she would be considered trespassing after nearly 10 years of service at NYU Langone Medical Center.

## NYU TREATED SIMILARLY SITUATED EMPLOYEES DIFFERENTLY

82. A similarly situated employee had expressed "constant stress of worrying about my father and sister in war-torn Ukraine." Although similar to the sentiment that Plaintiff had expressed in her speech that was deemed unacceptable and led to her termination, this statement was ostensibly deemed acceptable by NYU-Langone and it was subsequently circulated by NYU-Langone in a widely circulated in a hospital newsletter after the employee had passed away.

83. The CEO circulated a companywide email referring to "the continuous conflict in Ukraine and a new war in the Middle East." In other email, the CEO commended the Ukrainian president Voloddymyr Zelensky.

84. As previously described above, Sherry Cohen was able to post her political and personal opinions regarding the conflict on her private social media and discuss it in the workplace without being reprimanded, whereas Plaintiff did not enjoy that same freedom.

**COUNT ONE**
**Race and National Origin Discrimination in Violation of Title VII of the Civil Rights Act of 1964**
**(42 U.S.C. §§ 2000e, et seq.)**

85. Plaintiff realleges paragraphs 1 through 71 hereof.

86. NYU receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI and Title VII of the Civil Rights Act of 1964. Discrimination against Palestinians based on ethnicity or origin is prohibited under Title

VI.

87. Plaintiff is of Palestinian ethnicity and origin, which brings her within the scope of Title VI'Is protections.

88. Title VII prohibits a recipient of federal funds from intentionally treating any individual worse, even in part because of his or her ethnicity or creed. The acts and omissions of Defendant and its administrators have subjected, and continue to subject, Plaintiff to discrimination and harassment on the basis of her identity.

89. Defendant and its administrators had actual notice that such discrimination and harassment, over which Defendant has substantial control and the authority to remediate, was, and continues to be, so severe, pervasive, and objectively offensive that it created, and continues to create, a hostile environment based on Palestinian identity.

90. Defendant and its administrators intentionally discriminated against Plaintiff on the on the basis of her Palestinian identity, in violation of Title VI. Specifically, NYU and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Plaintiff and against other Palestinian members of the Defendant's community, which they are forced to endure because of their identity.

91. Additionally, Defendant continues to fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring. Such unlawful deliberate indifference caused Plaintiff and others similarly situated to be subjected to a hostile work environment.

92. This environment, which has been rendered hostile for Plaintiff and others, is sufficiently severe, pervasive, persistent, and offensive such that it deprived them of equal access to the employment opportunities and benefits that Defendant provides to employees who are not Palestinian.

93. Defendant and its administrators actively and intentionally engage in this pattern of severe and pervasive discrimination.

94. Defendant continues to unreasonably fail to act, or to act inadequately and discriminatorily, and with deliberate indifference and/or unjustifiable delay, in applying its policies to known or reported incidents where the victim or complainant is an Palestinian employee. As detailed above, Defendant's actions, inactions, and conduct were intended to treat Plaintiff and the others differently as Palestinians as compared to other similarly situated employees.

95. Defendant's acts and omissions are the actual, direct, and proximate causes of Plaintiff's injuries.

96. As a result of the foregoing, Plaintiff suffered substantial damages in amounts to be determined at trial.

97. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

98. Plaintiff exhausted remedies by filing a complaint with the Equal Employment Opportunity Commission ("EEOC") and, thereafter, obtaining a Right to Sue Letter from the EEOC.

## COUNT TWO
*New York State Human Rights Law*

99. Paragraphs 1 through 85 are re-alleged.

100. New York Human Rights Law § 291 provides that the opportunity to be employed at institutions like Defendant without discrimination because of race, creed, or national origin, is a civil right.

101. Plaintiff's Palestinian identity brings her within the scope of NYHRL's protections.

102. Plaintiff was also subjected to reverse discrimination, due to the Defendant' privileging a putatively protected group, Zionist Jewish people, over everyone who is not

a member of the group.

103. The acts and omissions of Defendant subjected Plaintiff to discrimination and harassment on the basis of her ethnicity and origin.

104. Defendant and its administrators had actual notice that such discrimination and harassment, over which Defendant had substantial control and the authority to remediate, was so severe, pervasive, and objectively offensive that it created a hostile environment based on her Palestinian identity, that deprived the Plaintiff of her rights as an employee of Defendant.

### THIRD COUNT
*New York City Human Rights Law*

105. Paragraphs 1 through 91 are re-alleged.

106. New York City Admin. Code § 8-107(4) prohibits NYU from subjecting Plaintiff to discrimination or harassment, including based on actual or perceived race or origin, or her non-inclusion in a protected category (reverse discrimination).

107. The acts and omissions of Defendant and its administrators and other employees subjected Plaintiff to discrimination and harassment that is severe and pervasive.

108. Plaintiff suffered substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

109. Plaintiff has complied with the procedural requirements of N.Y.C. Admin. Code § 8-502 by serving notice of this Complaint upon the City Commission on Human Rights and the Corporation Counsel.

110. Plaintiff is entitled to attorneys' fees and costs pursuant to N.Y.C. Admin. Code § 8-502(g).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

A. Awarding Plaintiff for her past and future loss of wages and benefits, plus interest;

B. Awarding to Plaintiff liquidated damages incurred in connection with this action, equal to the sum amount of backpay and interest;

C. Awarding to Plaintiff compensatory damages for emotional distress and punitive damages;

D. Awarding to Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action; and

E. Granting Plaintiff such additional or alternative relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury on all claims properly triable by a jury.

Dated: Queens, New York
January 31, 2025

Yours, etc.,
MUSA OBREGON LAW, P.C.

By: _____

MUSA OBREGON LAW, P.C.
Attorney for Plaintiff
55-21 69th St., Floor 2
Maspeth, NY 11378
718-803-1000
k.ashanti@musa-obregon.com

/s/ Brendan "Burhan" Carroll*

o/b/o The Council on American-Islamic Relations, New York Chapter ("CAIR-NY")
Attorney for Plaintiff
80 Broad St., 5th Floor
New York, NY 10004
646-665-7599
legal@ny.cair.com



*Application for admission to court pending